UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No.: 6:19-cv-1888-Orl-40DCI
Criminal Case No.: 6:11-cr-356-Orl-40DCI

SHELDON JOEL RAMNARAINE,

    Petitioner,

v.

UNITED STATES OF AMERICA,

    Respondent.
_____/

## SWORN AFFIDAVIT OF CAPT. JOHN C. MCCLURE

**COMES NOW,** Captain John C. McClure, U.S. Navy, Ret., and files this, his sworn affidavit in support of the claims made against Francis Wesley "Buck" Blankner, Jr. ("Mr. Blankner"), by Sheldon Joel Ramnaraine ("Sheldon") in his Motion to Vacate, Set Aside, or Correct Sentence. Your Affiant was privileged to first-hand information regarding Mr. Blankner's conduct and performance in the course of the underlying criminal proceeding. Your Affiant is 52 years of age at the date of this document; I am of sound mind and capable of making this affidavit. In support Sheldon's Motion to Vacate, Your Affiant declares the following under the penalty of perjury, pursuant to Title 28 U.S.C. § 1746:

    The Petitioner in this matter is my brother-in-law; his sister, Urmila McClure, is my wife. In April 2011, Urmila and I met with Mr. Blankner for the first time at his office in Orlando, Florida. Our family considered hiring Mr. Blankner to represent Sheldon after he was interrogated by the FBI on the University of Florida campus.

    Mr. Blankner was approximately 30 minutes late for our first meeting and seemed to be in a rush when he finally arrived. Based on my observation, this was often the case. At our meeting, Mr. Blankner stated that he previously handled many child pornography cases and was very confident Sheldon would not

1

be indicted. Mr. Blankner explained that he would charge Sheldon $10,000 to have a conference with the Assistant United States Attorney on the case. He further explained that he would charge an additional $15,000 if the U.S. Attorney filed an indictment. I gave my in-laws $2,500 to put towards Mr. Blankner's $10,000 fee because neither Sheldon nor his parents had enough money to cover the down payment. Mr. Blankner assured us that Sheldon "will be fine," and said he would "speak with the judge" to ensure an indictment was not forthcoming.

Despite Mr. Blankner's assertions, Sheldon was indicted in October and we were forced to pay Mr. Blankner more money. I was in attendance at Sheldon's first court appearance on October 31, 2011. Sheldon's trial was set to begin on December 5, 2011 and Mr. Blankner said that he was engaged in meetings with the prosecutor in preparation for trial. Mr. Blankner promised he had everything under control and told us not to worry. In November 2011, Sheldon had a follow-up meeting with Mr. Blankner at his office to discuss the upcoming trial. Sheldon and his parents requested I accompany Sheldon at the meeting for moral support. They believed that I would have a better understanding of these matters because I am college educated. In the meeting, Mr. Blanker stated that he was preparing to hire a psychologist to testify on Sheldon's behalf at trial. He explained the psychologist would testify that Sheldon was neither sexually attracted to children, nor a threat to society. He further explained that a favorable testimony by a certified psychologist would serve to counter the Government's attempt to disparage Sheldon's character at trial. Sheldon and I listened very closely to Mr. Blankner as he spoke.

No one in our family, including myself, had a true understanding of Sheldon's rights or legal options but Mr. Blankner stated that he would try his best to make Sheldon "look really good at trial." Sheldon stated that the FBI never read him his Miranda rights, and that the police seized his computer against his will, despite not having found any child pornography in his possession. Although we did not understand the judicial system and proper police protocol, Sheldon felt strongly that the FBI had somehow violated his rights by taking his things.  The meeting with Mr. Blankner was short and left us with more questions than answers.

In December 2011, Mr. Blankner called another meeting at his office and we learned that the judge in Sheldon's case had changed from Judge Scriven to Judge Honeywell. At the meeting, Mr. Blankner appeared harried and distracted. We thought that Mr. Blankner would offer more information regarding his plans for Sheldon's trial. Instead, he began to haggle with his fee. At this point in time, our family had cumulatively paid Mr. Blankner $13,500. Now, Mr. Blankner wanted more money and even went as far as to make a special deal with Sheldon and his parents. Mr. Blankner offered to forgive the remaining balance on the $25,000 fee if Sheldon could make one final lump-sum payment of $5,000. Sheldon and my in-laws were desperate; we all wanted to help Sheldon in any way possible. On December 15, 2011, I agreed to make the $5,000 payment with my credit card because Sheldon and his parents simply did not have the money.

After he received the final payment, Mr. Blankner did a complete "180" on his prior assessment of Sheldon's case. Contrary to his previous claims, Mr. Blankner now said that these were "very serious charges," and "very hard to defend, even if you're innocent." Mr. Blankner now explained that just being accused of such crimes was enough to convict. Furthermore, he now stated Sheldon should enter a guilty plea. Our last redeeming hope was that Mr. Blankner still insisted on retaining a psychologist to testify on Sheldon's behalf. Thereafter, Mr. Blankner ceased communicating with our family and went completely off the radar.

Sometime later, in the spring of 2012, Sheldon shared with me a document he received from Mr. Blankner's office. He wanted me to review the document because Mr. Blankner had asked him to sign it but he did not understand it. Despite my education, I also had difficulty understanding the document. Mr. Blankner had underlined certain portions of the document. The phrase "5 years" stood out to me, but I did not completely comprehend its meaning or purpose. From my understanding at the time, it seemed as though Sheldon would receive five years in prison if he signed the document. In the end, I was unable to offer Sheldon any assistance regarding the document because I myself did not fully understand it.

My next encounter with Mr. Blankner was not until July 2012, when Sheldon's parents, along with my wife and I, attended Sheldon's final court hearing. Mr. Blankner advised our family that Sheldon would

return home at the end of the hearing. As it turns out, Sheldon was sentenced to 87 months in prison and immediately taken into custody. We were caught off guard and unprepared for what happened. My wife and Sheldon's parents broke down emotionally and the US Marshals took Sheldon into custody. We were all shocked.

The hearing consisted mostly of the prosecutor laying out her case for sentencing, in pursuit of the what seemed like the highest possible prison sentence. It surprised all of us because Mr. Blankner was leading us to believe that these matters had been previously resolved. During the course of the case, Mr. Blankner often said things like, "I'm talking to the prosecutor to get it all worked out." It appeared to me, however, that the prosecutor came out of the gate like a racehorse wanting to crucify Sheldon, and Mr. Blankner was not helping. In fact, it seemed as though he intended on assisting the prosecution and making things worse for his own client. It sounded as though Mr. Blankner never really conferred with the prosecutor; why else would she be seeking the maximum penalty?

I was stunned by the prosecutor's intensity and even more so by Mr. Blankner's indifference and abhorrent failure to defend Sheldon. He did not object to any of the claims or assertions made by the prosecutor and nothing she said seemed to warrant any type of rebuttal. I remember thinking, "Why are you even here?"

My family was devastated, especially my wife and Sheldon's parents. Upon exiting the court room, Mr. Blankner hastily and vehemently declared that this should not have happened, and promised he would certainly appeal Sheldon's case. At that moment, Mr. Blankner offered us what he characterized as a "deal," and asked for $2,500 to complete Sheldon's appeal. We were distraught and desperate so my in-laws paid Mr. Blankner $2,500 for the appeal.

After Sheldon went to prison, Mr. Blankner became aloof and almost impossible to reach. On numerous occasions, my wife called Mr. Blankner's office for updates. Mr. Blankner's receptionist, however, claimed that he was unavailable because he was either "in court" or "out of the office." She often promised that Mr. Blankner would call us back, but our calls were never returned.

A few months after he was sentenced, Sheldon called us on the phone and said his appeal had been dismissed. We did not understand how or why this happened. In Mr. Blankner's last communication with our family, he assured us that he had "everything under control," as he did many times throughout the case. We still had not received an explanation from Mr. Blankner, however, as to why Sheldon's case was dismissed.

Shortly thereafter, our family made an unannounced visit to Mr. Blankner's office and asked to meet with him. Like in phone calls, the receptionist informed us that Mr. Blankner was not in the office at that time nor would he return until much later. We informed her that we would all sit and wait in the reception area for Mr. Blankner's return. While sitting in the waiting area, the receptionist advised other parties, who had arrived after us, that they may go upstairs where Mr. Blankner's office was located. It became clear that the receptionist lied and Mr. Blankner was in the office but simply evading us. After being repeatedly skipped, I approached the receptionist and declared, in a stern voice that, "I'm just going to walk on up [to Mr. Blankner's office], so either tell him [Mr. Blankner] I'm coming up or I'm just going to go up there now." I walked up the stairs and, unsurprisingly, found Mr. Blankner sitting in his office.

At first, Mr. Blankner's demeaner was accommodating, as though nothing had happened. His disposition changed, however, when we asked him for a copy of Sheldon's discovery. At this point in time, Sheldon had learned about discovery and evidence in prison and, from my knowledge, wished to receive his discovery as to pursue other avenues for legal relief. Mr. Blankner eventually provided Sheldon with his discovery but only after repeated requests. The entire process as a whole was confusing and Mr. Blankner did nothing to offer any clarification as to the facts of the case, Sheldon's rights, or his options. In fact, the truth of what really happened, and the evidence in support of Sheldon's innocence, only became evident after Sheldon went to prison and pursued numerous appeals.

Since all of these events, we became aware of many complaints and charges lodged against Mr. Blankner for the same or similar misconduct. Mr. Blankner has since been repeatedly admonished by the Florida Bar Association and the Florida Supreme Court. Most recently, Mr. Blankner's misconduct

resulted in a temporary suspension from practicing law. In the end, he seems to be the type of lawyer who just takes your money, makes you feel good and leaves you to the wolves.

This is a true, correct, and complete statement made with first-hand knowledge by the Affiant, Capt. John C. McClure, made this ___11___ day of ___May___ 2020 within the county of Hillsbourough, Florida.

Respectfully Submitted,

Capt. John C. McClure, U.S. Navy, Ret.